Jerry Lee PUGH, for himself and all others similarly situated, Plaintiffs,

v.

Judson C. LOCKE, Jr., individually and in his official capacity as Commissioner of the Alabama Board of Corrections, et al., Defendants.

WILCOX COUNTY COMMISSION, as the governing body of the County of Wilcox, State of Alabama, and all other counties similarly situated, and Association of County Commissions of Alabama, a voluntary association, Intervening Ancillary Plaintiffs,

v.

Melba Till ALLEN, individually and as State Treasurer, State of Alabama, et al., Ancillary Defendants,

Ira DeMent, United States Attorney, Amicus Curiae.

Worley JAMES et al., Plaintiffs,

v.

George C. WALLACE, individually and in his official capacity as Governor of Alabama, et al., Defendants.

WILCOX COUNTY COMMISSION, as the governing body of the County of Wilcox, State of Alabama, and all other counties similarly situated, and Association of County Commissions of Alabama, a voluntary association, Intervening Ancillary Plaintiffs,

v.

Melba Till ALLEN, individually and as State Treasurer, State of Alabama, et al., Ancillary Defendants,

The National Prison Project of the American Civil Liberties Union Foundation, Inc., and Ira DeMent, United States Attorney, Amici Curiae.

Civ. A. Nos. 74–203–N, 74–57–N.

United States District Court,
M. D. Alabama, N. D.

Jan. 13, 1976.

Robert D. Segall, Hobbs, Copeland, Franco & Screws and Joseph J. Levin, Jr., Montgomery, Ala., for plaintiffs Pugh.

William J. Baxley, Atty. Gen., Larry R. Newman, Asst. Atty. Gen., State of Ala., and Robert S. Lamar, Jr., Special Asst. Atty. Gen., Ball, Ball, Matthews & Lamar, Montgomery, Ala., for defendants and ancillary defendants.

James W. Webb, Montgomery, Ala., for intervening ancillary plaintiffs.

Ira DeMent, U. S. Atty., and Kenneth E. Vines, Asst. U. S. Atty., M. D. Ala., Montgomery, Ala., for amicus curiae.

George Peach Taylor, University, Ala., for plaintiffs James et al.

Matthew L. Myers and Alvin J. Bronstein, Washington, D. C., and Ralph I. Knowles, Jr., University, Ala., for amicus The National Prison Project of the American Civil Liberties Union Foundation, Inc.

## MEMORANDUM OPINION

JOHNSON, Chief Judge.

In these consolidated class actions,[1] plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 for deprivation of their Eighth and Fourteenth Amendment rights. This Court has jurisdiction under 28 U.S.C. §§ 1343, 2201 and 2202. This Court, as authorized by Rule 52 of the Federal Rules of Civil Procedure, incorporates in this memorandum opinion the appropriate findings of fact and conclusions of law.

The Court finds that these actions are maintainable as class actions under Federal Rule 23(a) and (b)(2). The class is composed of all persons presently confined by the Alabama Board of Corrections or who may be so confined in the future. The Court finds that the class is so numerous that joinder is impracticable; that the questions of law and fact presented by the named plaintiffs are common to the class, as are the claims presented by the class representatives; and that the competent representation provided the named plaintiffs will adequately protect the interests of the class as a whole. The Court further finds that the defendants in both cases have acted and refused to act on grounds applicable to the class, for which both declaratory and injunctive relief are appropriate. The defendants, sued in their individual and official capacities, are the Governor of Alabama, the Commissioner of the Alabama Board of Corrections,[2] the Deputy Commissioner of the Alabama Board of Corrections, the members of the Board of Corrections, the Warden of Kilby Corrections Facility,[3] and the Warden of G. K. Fountain Correctional Center. The predecessors in office of these defendants, who were sued in their individual and official capacities, are retained as individual defendants. The Court has also had the able assistance of United States Attorney Ira DeMent and the American Civil Liberties Union National Prison Project, as amici curiae.

The complaint in *Pugh v. Locke* was originally filed by an inmate of G. K. Fountain Correctional Center on February 26, 1974. The amended complaint was filed by court-appointed counsel on April 16, 1974, seeking declaratory, in-

---

1. These class actions were consolidated on June 27, 1975, and tried together. Following trial of these cases, the pleadings in *Pugh* were amended to conform to the evidence, and the relief requested is now essentially identical to that requested in *James*. Consequently, this order will be entered in both cases. See Fed.R.Civ.P. 15(b).

2. The original defendant, Commissioner L. B. Sullivan, left office during the pendency of these actions. His successor, Judson C. Locke, Jr., replaces Sullivan as a defendant. See Fed.R.Civ.P. 25(d).

3. Kilby Corrections Facility was formerly Mt. Meigs Medical and Diagnostic Center. The name of the institution was changed by Act of the Alabama Legislature during the pendency of these actions.

junctive and monetary relief for the alleged failure of defendants to adequately protect the plaintiff class from violence on the part of other inmates. The complaint was filed on behalf of a class composed of all inmates of the state penal system who have been or may be confined to G. K. Fountain Correctional Center and who have been, are, or may be subjected to such violence. At the request of plaintiffs, the claims for monetary damages were severed by order of June 27, 1975. The action proceeded on the claims for declaratory and injunctive relief.

The original complaint in *James v. Wallace* was filed on June 21, 1974. An amended complaint was filed thereafter on July 29, 1974, by court-appointed counsel. That complaint, on behalf of all inmates incarcerated in state penal institutions, essentially alleges that defendants fail to provide adequate rehabilitation opportunities for inmates, maintain conditions in these institutions which make rehabilitation impossible, and provide the opportunities that do exist in an unequal manner—all in violation of plaintiffs' Eighth and Fourteenth Amendment rights.

After extensive pretrial discovery by parties and amici curiae, the cases were heard beginning August 20, 1975, in a trial that lasted seven days. Because many facts were stipulated, the evidence at the trial consisted largely of expert testimony. The cases are now submitted on evidence offered at trial, depositions, exhibits, photographs, briefs and over 1,000 stipulated facts. The trial concluded with the admission by defendants' lead counsel, in open court, that the evidence conclusively established aggravated and existing violations of plaintiffs' Eighth Amendment rights.

The Alabama Board of Corrections (hereinafter the Board) is charged with the responsibility for managing the state's penal institutions.[4] The Board currently operates four large institutions for male inmates—Holman Unit Prison, G. K. Fountain Correctional Center, Draper Correctional Center, and Kilby Corrections Facility. Kilby also contains the hospital facility for all state prisoners and the classification center for male inmates. The Board also maintains Julia Tutwiler Prison for women and the Frank Lee Youth Center for young men.[5] Additionally, there are six road camps, one pre-release center, and eight work-release centers. Currently the inmate population of these institutions is in excess of 5,000.

The four principal institutions are horrendously overcrowded. At the time of the trial of these cases the prison population in these four institutions was as follows:

| | Maximum Number for Which Designed | Number in Custody |
|---|---|---|
| Fountain | 632 | Over 1100 |
| Holman | 540 | Over 750 |
| Draper | 632 | Over 1000 |
| Kilby | 503 | Over 700 |

The overcrowded condition of these institutions is the subject of another class action, *McCray v. Sullivan*, 399 F.Supp. 271 (S.D.Ala.1975). Following the close of evidence in the instant cases, a joint interim order was entered by this Court and the *McCray* court, enjoining the defendants from accepting any new prisoners, except escapees and parole violators, into these four institutions until the population in each is reduced to design capacity.[6] The purpose of that emergency order was to prevent aggravation of the conditions created by the grave Eighth Amendment violations.

The effects of severe overcrowding are heightened by the dormitory living ar-

---

4. Ala.Code tit. 45, §§ 3, 10(1) (1958).

5. To be eligible for assignment to Frank Lee Youth Center an inmate must be no more than 23 years old, must have a sentence of less than 10 years, must not have been convicted of a crime involving violence, and must have no history of drug abuse.

6. Order of August 29, 1975.

rangements which prevail in these institutions. Bunks often are packed together so closely that there is no walking space between them. Sanitation and security are impossible to maintain. There was testimony that the quarantine population at Kilby[7] is so crowded that inmates have to sleep on mattresses spread on floors in hallways and next to urinals. As will be noted, overcrowding is primarily responsible for and exacerbates all the other ills of Alabama's penal system.

The dilapidation of the physical facilities contributes to extremely unsanitary living conditions. Testimony demonstrated that windows are broken and unscreened, creating a serious problem with mosquitoes and flies. Old and filthy cotton mattresses lead to the spread of contagious diseases and body lice. Nearly all inmates' living quarters are inadequately heated and ventilated. The electrical systems are totally inadequate, exposed wiring poses a constant danger to the inmates, and insufficient lighting results in eye strain and fatigue.

In general, Alabama's penal institutions are filthy. There was repeated testimony at trial that they are overrun with roaches, flies, mosquitoes, and other vermin. A public health expert testified that he found roaches in all stages of development—a certain indicator of filthy conditions. This gross infestation is due in part to inadequate maintenance and housekeeping procedures, and in part to the physical structure of the buildings themselves. For example, floors in many shower rooms are so porous that it is impossible to keep them clean. Plumbing facilities are in an exceptional state of disrepair. In one area at Draper, housing well over 200 men, there is one functioning toilet. Many toilets will not flush and are overflowing. Some showers cannot be turned off and continually drip or even pour water. Frequently there is no hot running water for substantial periods of time. Witnesses repeatedly commented on the overpowering odor emanating from these facilities.

Personal hygiene is an insurmountable problem in these circumstances. The parties stipulated that the state supplies prisoners only with razor blades and soap. It was further stipulated that the state furnished no toothpaste, toothbrushes, shampoo, shaving cream, razors or combs; but that such items are available for those inmates who can afford them. Further, household cleaning supplies rarely are available for inmates to maintain their living areas.

Food service conditions are equally unsanitary. Food is improperly stored in dirty storage units, and is often infested with insects. Mechanical dishwashers are not adequately maintained and therefore do not even approach the minimum temperature required for proper sanitation. Moreover, food service personnel, many of whom are inmates, are often untrained and do not follow proper sanitation procedures in the handling and preparation of food. Inmates are not supplied with reasonable eating and drinking utensils; some inmates drink from used tin cans, and have to wash and save their own utensils from meal to meal. Garbage sits in large open drums throughout the dining halls. As a general rule, the food is unappetizing and unwholesome. Inmates with some source of funds may supplement their diets from the prison canteen, but the large majority must subsist only on what is supplied by the kitchen. One menu is prepared for all inmates who require a special diet, regardless of whether it meets their particular needs.

One expert witness, a United States public health officer, toured facilities at Draper, Fountain, Holman, and Kilby. He testified at trial that he found these facilities wholly unfit for human habitation according to virtually every criteri-

---

7. Kilby is the receiving center for inmates being processed in and out of state prisons. New inmates are kept in quarantine for approximately six weeks. Kilby also maintains a permanent population of approximately 150.

on used for evaluation by public health inspectors. With very few exceptions, his testimony was that, if such facilities were under his jurisdiction, he would recommend that they be closed and condemned as an imminent danger to the health of the individuals exposed to them. This Court credits this testimony and makes it a part of these findings.

There is no working classification system in the Alabama penal system, and the degree to which this impedes the attainment of any proper objectives of a penal system cannot be overstated. Although classification personnel throughout the state prisons have been attempting to implement a wholly new classification process established in January, 1975, understaffing and overcrowding have produced a total breakdown of that process. For no valid reason apparent from the evidence, far too many inmates receive maximum security classifications under the present classification system. Moreover, during what is called the classification process, new inmates, who are already trying to adjust to the new environment of the prison, are restricted to the overcrowded living quarters and are permitted neither visitors nor recreation. Testing and evaluation of these individuals, essential to a working classification system, cannot be regarded as reliable or even useful when conducted under such traumatic and stressful conditions.

Prison officials do not dispute the evidence that most inmates are assigned to the various institutions, to particular dormitories, and to work assignments almost entirely on the basis of available space. Consequently, the appreciable percentage of inmates suffering from some mental disorder is unidentified, and the mentally disturbed are dispersed throughout the prison population without receiving treatment. This Court previously found in an Alabama prison system case that approximately 10 percent of the inmate population are psychotic, and that another 60 percent are disturbed enough to require treatment.[8] The evidence in the instant cases clearly reflects that nothing has been done to alleviate this situation. Some of these inmates should, according to the undisputed evidence presented in these cases, be transferred to a facility for the criminally insane, and many others should be treated within the penal system. The evidence further reflects that there are also a number of mentally retarded inmates who need to be, according to any humanitarian concept, identified and placed in an appropriate environment. A 1972 study prepared by the University of Alabama Center for Correctional Psychology, under contract with the Board of Corrections, highlighted the woefully inadequate mental health program in Alabama prisons and suggested minimum standards. None of these recommended standards have been implemented. The findings and conclusions of that study are fully supported by the evidence in these cases.

Further effects of failure to classify are manifold. Violent inmates are not isolated from those who are young, passive, or weak. Consequently, the latter inmates are repeatedly victimized by those who are stronger and more aggressive. Testimony shows that robbery, rape, extortion, theft and assault are everyday occurrences among the general inmate population. Rather than face this constant danger, some inmates voluntarily subject themselves to the inhuman conditions of prison isolation cells.

Emotional and physical disabilities which require special attention pass unnoticed. There is no rational basis on which to assign inmates to the few vocational, educational and work opportunities which do exist. All of this contributes to the apathy, tension and frustration which pervade Alabama prisons.

The inmate population also contains a number of aged and infirm who are often housed in dormitories in which conditions are particularly hazardous. There

---

**8.** *Newman v. Alabama,* 349 F.Supp. 278 (M.D. Ala.1972), *aff'd in part* 503 F.2d 1320 (5th Cir. 1974), *cert. denied* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975).

are no special programs to meet the needs of these people and they are frequently unprotected from the general population. For example, in Draper such prisoners—some of them confined to wheelchairs, others scarcely able to move without help—are left without supervision in second-floor quarters that are accessible only by stairway, with no means of evacuation in the event of fire or other physical emergency, and utterly helpless in the event of the sort of medical emergency to which the elderly are susceptible. In this idleness, filth and despair, the condition of these inmates can be expected only to deteriorate further.

Each of these failings in Alabama's penal system is compounded by that system's most pervasive and most obvious problem: the overcrowding with which all prisoners must live. Yet even if the inmate population were reduced to design capacity, the system would still be woefully understaffed. Former Commissioner Sullivan testified that the four large institutions alone need, at a minimum, 692 guards, but that they currently employ only 383. Guards rarely enter the cell blocks and dormitories, especially at night when their presence is most needed. The extremely high inmate-to-staff ratio makes personal interaction between the two virtually impossible because staff members must spend all their time attempting to maintain control or to protect themselves.

Another result of understaffing is that some inmates have been allowed to assume positions of authority and control over other inmates, creating opportunities for blackmail, bribery, and extortion. Some prisoners are used as "strikers" to guard other inmates on farm duty and as "cell flunkies" to maintain order and perform tasks for prison staff. They are afforded special privileges, including freedom to ignore prison regulations and to abuse other inmates. Inmate clerks have access to the institutional files and mail of other inmates; inmate medical aides are used to dispense some medication, which they may withhold at will.

The problems posed by understaffing are aggravated by the fact that most of the large institutions are located in rural areas of the state. The guards, drawn largely from the local population, are practically all white and rural in contrast to the predominantly black and urban inmate population they supervise. A number of witnesses testified that staff members address black inmates with racial slurs, further straining already tense relations.

In view of the foregoing, the rampant violence and jungle atmosphere existing throughout Alabama's penal institutions are no surprise. The evidence reflects that most prisoners carry some form of homemade or contraband weapon, which they consider to be necessary for self-protection. Shakedowns to remove weapons are neither sufficiently thorough nor frequent enough to significantly reduce the number of weapons. There are too few guards to prevent outbreaks of violence, or even to stop those which occur.

While it is clear that violence is widespread, there are no accurate statistics on the incidence of violence. A cardinal precept of the convict culture is that no inmate should report another inmate to officials. This reluctance to report violence is compounded by the failure of prison officials to keep accurate records of violence which does come to their attention.

One 20-year-old inmate, after relating that he has been told by medical experts that he has the mind of a five year old, testified that he was raped by a group of inmates on the first night he spent in an Alabama prison. On the second night he was almost strangled by two other inmates who decided instead that they could use him to make a profit, selling his body to other inmates.

An inmate required to live in these circumstances stands no chance of leaving the institution with a more positive and constructive attitude than the one he or she brought in. The evidence reflects that even if rehabilitation programs, adequate in number and quality,

were available, whatever benefit might be derived from them could be undone quickly by this inhumane environment. Consequently, this Court finds that these conditions create an environment in which it is impossible for inmates to rehabilitate themselves—or to preserve skills and constructive attitudes already possessed—even for those who are inclined to do so. Further, this Court finds that these conditions create an environment that not only makes it impossible for inmates to rehabilitate themselves but also makes dehabilitation inevitable.

Inmates are denied any meaningful opportunity to participate in vocational, educational or work activities. As a result, most inmates must spend substantially all of their time crowded in dormitories in absolute idleness. Such unbroken inactivity increases boredom, tension and frustration, which in turn promote incidents of violence. The evidence reflects that idleness of this magnitude destroys any job skills and work habits inmates may have, and contributes to their mental and physical degeneration.

An examination of the very few rehabilitative programs which do exist reveals that they are totally inadequate to provide reasonable opportunities for rehabilitation—or even to prevent physical and mental deterioration—of most of the inmate population. It was stipulated that the average reading level of prisoners entering the penal system in the first quarter of the year 1975 was below the sixth grade level. Yet basic education classes are available to only a small number of inmates. For example, Holman Prison, with more than 750 inmates, offers Adult Basic Education for only 40 inmates at any one time. At Kilby, an inmate conducts that institution's only basic education class.

While the Board of Corrections has made some recent efforts to increase vocational training and work opportunities, those programs are available to only a limited number of selected inmates. Eligibility requirements for most programs are quite restrictive.[9]

In light of the stipulation that 59 percent of Alabama's state prisoners are unskilled—and that another 5.5 percent claim no occupation—it is clear that access to existing programs for these prisoners who need vocational training is minimal. For those few inmates who qualify, the range of occupations and trades offered is extremely limited.

The Board offers an acceptable rehabilitation opportunity to a limited number of inmates through one pre-release center and eight work-release centers. In addition to providing job skills, the programs allow prisoners to gradually re-enter the community and to save some money, up to 75 percent of their salaries, prior to release. Again, there are stringent eligibility requirements for the few openings in these programs.

The single exception to the dearth of rehabilitation programs is the Frank Lee Youth Center. However, that institution houses approximately 200 selected inmates who meet strict objective and subjective criteria.[10] Most inmates at Frank Lee can expect to participate in a number of educational, vocational and recreational activities. To date the inmate population at Frank Lee has been over 50 percent white in contrast to the predominantly black populations at other state penal institutions.

Institutional work assignments offer little to motivate inmates. There are too few jobs and most take only a few hours to perform. Frequently many more inmates are assigned to a particular job

---

9. For example, for entry into many programs an inmate must have no disciplinary violations for six months prior to enrollment, must have no holdovers, must have a regular duty assignment, must not be considered a security risk, and must be within 18 months of his or her release date upon completion of the course.

10. See note 5 *supra*. The Director of the Frank Lee Youth Center, William Gilmore, testified that he relied on his own subjective evaluation, as well as the criteria outlined in note 5, in selecting inmates.

than are required to accomplish it. Prisoners work for no pay and at jobs which do not teach usable skills. Inmates at Fountain and Holman, most of whom intend to return to metropolitan areas upon release, are routinely assigned to farm labor. Fountain operates a license tag plant, and Draper has a mattress factory. Neither of these programs is available to any significant number of inmates. Other inmates who have an assigned task perform housekeeping functions for the institution. As observed, the lack of meaningful work opportunities contributes to idleness, boredom, apathy and frustration.

The flow of money through Alabama prisons is for all practical purposes uncontrolled. Each prisoner receives 25 cents per week from the state, as well as postage and paper for one letter each week. There are almost no legitimate means for an inmate to earn money. Some prisoners receive substantial sums from outside sources and through contraband activities. Money is required to buy personal hygiene items, food to supplement the prison diet, and postage. Money can also buy drugs, alcohol, changes in institutional records, special privileges, sex, and housekeeping favors. Interest collected on loans made by inmates with money is exorbitant, and may be collected in a ruthless manner. Gambling, smuggling, and extortion are several of the abuses fueled by the failure of prison officials to control the possession of currency inside the institution. Finally, many prisoners must make the difficult transition from prison life on the pittance the state provides them upon release.[11]

There is no organized recreation program for Alabama's prisons. While some athletic facilities and equipment are available, they are not properly maintained. Almost no provision is made for inmates to participate in hobbies. Consequently, inmates have little to occupy the inordinate amount of free time they must fill.

The chances of successful rehabilitation or the chances of escaping mental and physical degeneration are also diminished by the fact that prison environment is much different from that in the society to which an inmate must return. Current visitation policies discourage visits—which are essential to the maintenance of community ties—and therefore decrease an inmate's chances of successful reintegration upon release. Some institutions allow visitors only on alternate Sundays, while inmates in quarantine at Kilby are permitted no visitors. Visiting areas are overcrowded and uncomfortable, allow no privacy, and prohibit physical contact in some instances. Public transportation to institutions located in remote areas of the state is infrequent and too expensive for many people to use regularly.

An oral order enjoining the use of isolation and segregation cells which do not meet minimum standards was issued by the Court at the conclusion of the trial in these cases. The indescribable conditions in the isolation cells required immediate action to protect inmates from any further torture by confinement in those cells. As many as six inmates were packed in four foot by eight foot cells with no beds, no lights, no running water, and a hole in the floor for a toilet which could only be flushed from the outside. The infamous Draper "doghouse" is a separate building, locked from the outside, with no guard stationed inside. Inmates in punitive isolation received only one meal per day, frequently without utensils. They were permitted no exercise or reading material and could shower only every 11 days. Punitive isolation has been used to punish inmates for offenses ranging from

---

11. The state is required by statute to provide an inmate, upon release, with "a decent suit of clothes and with the least expensive mode of public transportation back to the point of sentencing . . . ." Ala.Code tit. 45 § 54 (Supp.1973). The state also provides ten dollars in cash to all inmates serving five years or less, and an additional two dollars per year for each additional year served. Ala.Code tit. 45 § 55 (1958).

swearing at guards and failing to report to work on time, to murder.

 In light of the foregoing facts, this Court has a clear duty to require the defendants in these cases to remedy the massive constitutional infirmities which plague Alabama's prisons. It is with great reluctance that federal courts intervene in the day-to-day operation of state penal systems, *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Novak v. Beto,* 453 F.2d 661, 671 (5th Cir. 1971); *Diamond v. Thompson,* 364 F.Supp. 659, 662 (M.D.Ala.1973), a function they are increasingly required to perform.[12] While this Court continues to recognize the broad discretion required for prison officials to maintain orderly and secure institutions, *Procunier v. Martinez,* 416 U.S. at 404–05, 94 S.Ct. 1800; *Diamond v. Thompson,* 364 F.Supp. 659 (M.D.Ala.1973); *Newman v. Alabama,* 349 F.Supp. 278 (M.D.Ala. 1972), *aff'd in part* 503 F.2d 1320 (5th Cir. 1974), *cert. denied* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975), constitutional deprivations of the magnitude presented here simply cannot be countenanced, and this Court is under a duty to, and will, intervene to protect incarcerated citizens from such wholesale infringements of their constitutional rights. See *Procunier v. Martinez,* 416 U.S. at 405–06, 94 S.Ct. 1800; *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969).

 Federal litigation by prisoners alleging systemic constitutional deficiencies has mushroomed in recent years.

There has been growing recognition by the courts that prisoners retain all rights enjoyed by free citizens except those necessarily lost as an incident of confinement. See *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1973); *Jackson v. Godwin,* 400 F.2d 529, 532 (5th Cir. 1968); *Washington v. Lee,* 263 F.Supp. 327, 331 (M.D.Ala.1966), *aff'd per curiam,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); *cf. Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948); *Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974). The Supreme Court recently identified three legitimate functions of a correctional system: deterrence, both specific and general; rehabilitation; and institutional security. *Pell v. Procunier,* 417 U.S. at 822–23, 94 S.Ct. 2800. "It is in the light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners." *Id.* at 823, 94 S.Ct. at 2804. Therefore, when a prison policy advances one of these valid goals, the Court is required to weigh the competing interests of the prisoner and of the state in pursuing that goal. When an inmate is restricted in a manner which supports no such valid purpose, that restriction cannot stand.

 Prisoners are entitled to be free of conditions which constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The content of the Eighth Amendment is not static but "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d

---

12. Federal courts in a number of states including Massachusetts, *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass. 1973), *aff'd* 494 F.2d 1196 (1st Cir. 1974); Maryland, *Collins v. Schoonfield,* 344 F.Supp. 257 (D.Md.1972); Arkansas, *Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark.1970), *aff'd* 442 F.2d 304 (8th Cir. 1971); and Mississippi, *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss.1972), *aff'd* 501 F.2d 1291 (5th Cir. 1974), recently have had occasion to hold conditions in penal institutions in those states unconstitutional. In Alabama, this Court in previous cases has addressed the issues of inadequate medical care, *Newman v. Alabama,* 349 F.Supp. 278 (M.D. Ala.1972), *aff'd in part* 503 F.2d 1320 (5th Cir. 1974), *cert. denied* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); and disciplinary procedures, *Diamond v. Thompson,* 364 F.Supp. 659 (M.D.Ala.1973), in the state's prisons. Federal courts in other districts of this state have found unconstitutional conditions in both state, *McCray v. Sullivan,* 399 F.Supp. 271 (S.D.Ala.1975), and local, *Thrasher v. Bailey,* CA 73P 816–S (N.D.Ala. Aug. 29, 1973), penal facilities.

630 (1958). There can be no question that the present conditions of confinement in the Alabama penal system violate any current judicial definition of cruel and unusual punishment, a situation evidenced by the defendants' admission that serious Eighth Amendment violations exist.[13] In these circumstances, it is the very confinement itself which impermissibly contravenes the Eighth and Fourteenth Amendment rights of the plaintiff classes.

> [C]onfinement itself within a given institution may amount to a cruel and unusual punishment prohibited by the Constitution where the confinement is characterized by conditions and practices so bad as to be shocking to the conscience of reasonably civilized people even though a particular inmate may never personally be subject to any disciplinary action.

*Holt v. Sarver*, 309 F.Supp. 362, 372–73 (E.D.Ark.1970), *aff'd* 442 F.2d 304 (8th Cir. 1971).

The conditions in which Alabama prisoners must live, as established by the evidence in these cases, bear no reasonable relationship to legitimate institutional goals. As a whole they create an atmosphere in which inmates are compelled to live in constant fear of violence, in imminent danger to their physical well-being, and without opportunity to seek a more promising future.

■ The living conditions in Alabama prisons constitute cruel and unusual punishment. Specifically, lack of sanitation throughout the institutions—in living areas, infirmaries, and food service—presents an imminent danger to the health of each and every inmate. Prisoners suffer from further physical deterioration because there are no opportunities for exercise and recreation. Treatment for prisoners with physical or emotional problems is totally inadequate. This Court has previously ordered that the penal system provide reasonable medical care for inmates in these institutions on a finding that

> [f]ailure of the Board of Corrections to provide sufficient medical facilities and staff to afford inmates basic elements of adequate medical care constitutes a willful and intentional violation of the rights of prisoners guaranteed under the Eighth and Fourteenth Amendments.

*Newman v. Alabama*, 349 F.Supp. at 285–86. The evidence in these cases leads to the inescapable conclusion that the gross inadequacies in medical care found in that case have not been remedied.

■ Prison officials are under a duty to provide inmates reasonable protection from constant threat of violence.

While occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, *Penn v. Oliver*, 351 F.Supp. 1292 (E.D. Va.1972), confinement in a prison where violence and terror reign is actionable. A prisoner has a right, secured by the eighth and fourteenth amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates, and he need not wait until he is actually assaulted to obtain relief. *Woodhous v. Commonwealth of Virginia*, 487 F.2d 889, 890 (4th Cir. 1973); see *Finney v. Arkansas Board of Corrections*, 505 F.2d 194, 201 (8th Cir. 1974); *Gates v. Collier*, 501 F.2d 1291, 1308–09 (5th Cir. 1974); *Holt v. Sarver*, 309 F.Supp. 362, 376–78, 381 (E.D.Ark. 1970), *aff'd* 442 F.2d 304 (8th Cir. 1971).

■ The defendants in these cases have failed to carry out that duty. The evidence establishes that inmates are housed in virtually unguarded, overcrowded dormitories, with no realistic attempt by officials to separate violent, aggressive inmates from those who are passive or weak. The tension generated

---

**13.** Defendants through their lead counsel, the Honorable Robert S. Lamar, Jr., admitted in open court, at the close of trial, that plaintiffs had proved serious Eighth Amendment violations.

by idleness and deplorable living conditions contributes further to the ever-present threat of violence from which inmates have no refuge.

 The evidence in these cases also establishes that prison conditions are so debilitating that they necessarily deprive inmates of any opportunity to rehabilitate themselves, or even to maintain skills already possessed. While courts have thus far declined to elevate a positive rehabilitation program to the level of a constitutional right, it is clear that a penal system cannot be operated in such a manner that it impedes an inmate's ability to attempt rehabilitation, or simply to avoid physical, mental or social deterioration.

> The absence of an affirmative program of training and rehabilitation may have constitutional significance where in the absence of such a program conditions and practices exist which actually militate against reform and rehabilitation.

*Holt v. Sarver*, 309 F.Supp. at 379.

 . Not only is it cruel and unusual punishment to confine a person in an institution under circumstances which increase the likelihood of future confinement, but these same conditions defeat the goal of rehabilitation which prison officials have set for their institutions. See *James v. Wallace*, 382 F.Supp. 1177, 1180 n.4 (M.D.Ala.1974).

 Prisoners are protected by the Due Process and Equal Protection clauses of the Fourteenth Amendment, *Washington v. Lee*, *supra*; therefore, they must be free from arbitrary and capricious treatment by prison officials. *Sostre v. McGinnis*, 442 F.2d 178, 198–99 (2d Cir. 1971) (en banc), *cert. denied sub nom. Sostre v. Oswald*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 and *sub nom. Oswald v. Sostre*, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1971); *Jackson v. Godwin*, 400 F.2d 529, 532 (5th Cir. 1968). There is evidence in these cases that the Alabama penal system makes available a very limited number of vocational, educational, and work opportunities. Openings in whatever programs are offered must be assigned on a reasonable and rational basis. See *Thompson v. Gallagher*, 489 F.2d 443 (5th Cir. 1973). Currently, inmates are able to buy and sell desirable jobs. Moreover, while the prison system is entitled to make rational distinctions in making assignments, it is impossible to do so without a functioning classification system.

 The inmates' ability to engage in rehabilitation is further frustrated by unreasonable restrictions on visitation from family and friends. Any restrictions imposed by the prisons' visitation policies must be reasonably related to a legitimate governmental interest. See *Thompson v. Gallagher, supra.* The visitation policies currently employed by Alabama penal institutions do not serve the valid penal objectives defined by the Supreme Court in *Pell v. Procunier*, 417 U.S. at 822–23, 94 S.Ct. 2800.

 The response of the defendants to the matters set forth in this opinion consistently has been that they cannot alleviate the conditions because of inadequate funding by the state legislature. However, a state is not at liberty to afford its citizens only those constitutional rights which fit comfortably within its budget. The Alabama Legislature has had ample opportunity to make provision for the state to meet its constitutional responsibilities in this area, and it has failed to do so. It is established beyond doubt that inadequate funding is no answer to the existence of unconstitutional conditions in state penal institutions.

> Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.

*Holt v. Sarver*, 309 F.Supp. at 385. See *Finney v. Arkansas Board of Corrections*, 505 F.2d 194, 201 (8th Cir. 1974); *Gates v. Collier*, 501 F.2d 1291, 1319–20 (5th Cir. 1974).

In *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court held that, under Section 1983, plaintiffs can recover money damages from state officials if the officials acted either in bad faith or in "disregard of settled, indisputable law." *Id.* at 321, 95 S.Ct. 992. To put it another way: a public official may be held liable where he, in subjective good faith, acts in disregard of a person's "clearly established constitutional rights." *Id.* at 322, 95 S.Ct. 992. The Court now acts in these cases with a recognition that prisoners are not to be coddled, and prisons are not to be operated as hotels or country clubs. However, this does not mean that responsible state officials, including the Alabama Legislature, can be allowed to operate prison facilities that are barbaric and inhumane. Let the defendant state officials now be placed on notice that failure to comply with the minimum standards set forth in the order of this Court filed with this opinion will necessitate the closing of those several prison facilities herein found to be unfit for human confinement.

The costs of these proceedings will be taxed against the defendants.

An order will be entered accordingly.

## ORDER

Pursuant to the findings of fact and conclusions of law set forth in the memorandum opinion made and entered in this cause this date, it is the order, judgment and decree of this Court that:

1. Defendants, George C. Wallace, individually and in his official capacity as Governor of Alabama; The State of Alabama; The Alabama Board of Corrections; Judson C. Locke, Jr., individually and in his official capacity as Commissioner of the Alabama Board of Corrections; L. B. Sullivan, individually and in his capacity as Deputy Commissioner of the Alabama Board of Corrections; Bill Long, individually and in his official capacity as Warden of Kilby Corrections Facility; J. O. Davis, individually and as Warden of G. K. Fountain Correctional Center; M. B. Harding, individually; H. Crouch, individually; Yetta G. Samford, Jr., individually; Dr. Max V. McLaughlin, individually; and Reverend John E. Vickers, Dr. Thomas F. Staton, Dr. Marion L. Carroll, Jr., and Mr. Thomas E. Bradford, Sr., individually and as members of the Board of Corrections of the State of Alabama, their agents, employees, successors in office and any others acting in concert with them, be and each is hereby enjoined from failing to implement fully and within the times prescribed each of the requirements set forth in Appendix A to this decree.

2. A Human Rights Committee for the Alabama Prison System be and is hereby designated and appointed. The members of that Committee are listed in Appendix B attached hereto and incorporated herein. The members of the Committee shall be paid on a per diem basis and shall be reimbursed for travel and other expenses necessarily incurred at the same rate and in the same manner as members of the Alabama Board of Corrections. The function of the Human Rights Committee, acting as a Committee as a whole or through standing subcommittees appointed by the Committee chairman, shall be to monitor implementation of the standards set forth in Appendix A to this decree. In view of this Court's finding that the standards established in *Newman v. Alabama*, 349 F.Supp. 278, *aff'd in part* 503 F.2d 1320 (5th Cir. 1974), *cert. denied* 421 U.S. 928, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975), have not been implemented, the Human Rights Committee shall also have the authority and duty to monitor implementation of the requirements of that order. The Committee may at reasonable times inspect the state prison facilities, interview inmates, and inspect institutional records. The Committee shall review plans for implementation of this decree to ensure that they comport with the minimum standards set forth. At its

discretion, the Committee may engage and consult appropriate, independent specialists who shall be compensated by the Board of Corrections. The Committee shall be authorized to take any action reasonably necessary to accomplish its function. The Committee is also hereby authorized and empowered to employ upon a full time basis a staff consultant, trained and experienced in the operation of state prison systems, answerable only to the Human Rights Committee; said full time consultant shall be paid upon a basis and at a rate commensurate with the remuneration being received by the Commissioner of the Alabama Board of Corrections. The Committee is further authorized and empowered to employ [to be paid by the defendant Board] one full time clerk-stenographer, responsible only to the Committee. Adequate physical facilities and equipment and supplies will be made available to the consultant and to the clerk by the Alabama Board of Corrections.

3. The defendants, within six months from this date, shall submit to this Court a comprehensive report setting forth their progress in the implementation of each and every standard. The report shall set forth reasons for the incomplete implementation of any standard. The report shall also include a time-table for full compliance.

4. The court costs incurred in these proceedings be and are hereby taxed against the defendants. The defendants are ordered to pay to the Clerk of this Court within 30 days the court costs, as set forth on the costs bills of plaintiffs' attorneys.

5. Jurisdiction of these cases be and is hereby specifically retained.

## APPENDIX A

### MINIMUM CONSTITUTIONAL STANDARDS FOR INMATES OF ALABAMA PENAL SYSTEM

#### I. Overcrowding

1. The number of inmates in each institution in the Alabama penal system shall not exceed the design capacity for that institution. No new prisoners, except escapees and parole violators who have had their paroles revoked, may be accepted until the inmate population is no greater than the design capacity for each facility.

#### II. Segregation and Isolation

1. No more than one prisoner shall be confined in a single cell, and each such cell shall be a minimum of 40 square feet. Within six months, the area of each single occupancy isolation cell shall be no less than 60 square feet.

2. Each cell shall be equipped with a toilet which can be flushed from the inside, a sink with hot and cold running water, ventilation and lighting which meet minimum standards of the United States Public Health Service, clean linen, and a bed off the floor.

3. Each inmate confined in isolation shall be

(a) permitted to bathe at least every other day;

(b) provided three wholesome and nutritious meals per day, served with eating and drinking utensils;

(c) supplied the same toilet articles and linens as are required to be provided to the general inmate population;

(d) provided reading and writing materials, and allowed any personal legal papers or research materials;

(e) allowed at least 30 minutes outdoor exercise per day; and

(f) afforded adequate medical and mental health care, including examination by a physician and a qualified mental health care professional at least every third day. No inmate shall be deprived of physical aids or prosthetic devices.

4. Confinement in isolation shall be imposed as punishment only after compliance with the requirements of due process as set forth in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Any period of con-

finement for the purpose of punishment shall not exceed 21 days.

5. Any prisoner who is voluntarily segregated must be released immediately upon request.

6. The confinement of any prisoner in administrative segregation must be reviewed at least every seven days, and the prisoner must be released from segregation unless such review determines that there is good cause for continued segregation.

### III. *Classification*

1. By April 15, 1976, the defendants shall file with the Court a plan for the classification of all inmates incarcerated in the Alabama penal system. The Board of Corrections shall contract with the University of Alabama Department of Correctional Psychology to aid in the implementation of that plan. The classification shall be fully completed no later than August 16, 1976.

2. The plan to be submitted to the Court shall include:

(a) due consideration to the age; offense; prior criminal record; vocational, educational and work needs; and physical and mental health care requirements of each inmate;

(b) methods of identifying aged, infirm, and psychologically disturbed or mentally retarded inmates who require transfer to a more appropriate facility, or who require special treatment within the institution; and

(c) methods of identifying those inmates for whom transfer to a pre-release, work-release, or other community-based facility would be appropriate.

3. The classification of each inmate shall be reviewed at least annually.

### IV. *Mental Health Care*

1. The defendants shall identify those inmates who, by reason of psychological disturbance or mental retardation, require care in facilities designed for such persons, and arrangements shall be made for the transfer of such inmates.

2. The defendants shall identify those inmates who require mental health care within the institution and make arrangements for the provision of such care.

3. The defendants shall hire at least those mental health professionals and support personnel as set forth in *Minimum Mental Health Standards for the Alabama Correctional System.* (Center for Correctional Psychology, University of Alabama, December 1972).

### V. *Protection from Violence*

1. The defendants shall make reasonable efforts, including classification and monitoring, to segregate inmates known to engage in violence and aggression.

2. Only minimum custody inmates may be assigned to dormitories.

3. The defendants shall establish regular procedures, including frequent shakedowns and frisks of inmates returning to the institutions, to reduce the number of weapons held by inmates.

4. Defendants shall enforce prison regulations designed to reduce violence, including rules against fighting, possession of weapons, gambling, or possession of currency within the institutions. Inmates, except those in pre-release and work-release type programs, shall not possess currency. Defendants shall institute a scrip system for approved intra-institutional purchases by inmates.

5. With the exception of isolation units, guards shall be stationed inside living areas, including dormitories, at all times. There shall be at least one guard inside, and one guard outside, all living areas at all times. As to isolation units, guards must be stationed at all times so as to have visual and voice contact with the isolated prisoners.

6. At no time shall prisoners be used to guard other prisoners, nor shall prisoners be placed in positions of authority over other inmates.

7. The defendants shall keep accurate records of incidents of violence which come to their attention, and all assaults

and other offenses punishable under the laws of Alabama shall be reported forthwith to the local district attorney. Accurate records shall be kept reflecting the disposition of such incidents by prison authorities and any resultant criminal prosecutions undertaken.

## VI. *Living Conditions*

1. Prisoners shall be supplied, without charge, toothbrushes, toothpaste, shaving cream, razors and razor blades, soap, shampoo, and combs. Each prisoner also shall be provided adequate clean clothing and a storage locker with a lock.

2. Each prisoner shall be supplied weekly with clean bed linen and towels.

3. Each inmate shall have access to household cleaning supplies in order to maintain living areas, and sanitary conditions within the institutions shall meet minimum public health standards. The defendants shall be responsible for implementing a regular and effective program of insect and rodent control.

4. All institutions shall be adequately heated, lighted and ventilated. Windows and doors shall be properly screened and otherwise properly maintained. Electrical wiring must be safe.

5. Each prisoner shall have a bed off the floor, a clean mattress, and blankets as needed.

6. Each institution shall maintain in working order one toilet per 15 inmates, one urinal or one foot of urinal trough per 15 inmates, one shower per 20 inmates, and one lavatory per 10 inmates.

7. Each inmate shall have a minimum of 60 square feet of living space.

## VII. *Food Service*

1. Every prisoner is entitled to three wholesome and nutritious meals per day, served with proper eating and drinking utensils.

2. The food served to inmates shall be nutritionally adequate and properly prepared under the direction of a food service supervisor for each institution; each supervisor shall have at least bachelor's level training in dietetics or its equivalent. The defendants shall employ a nutrition consultant for the Board of Corrections, who shall be a registered dietitian, to assist in menu planning, methods of food preparation, purchasing standards, and sanitation.

3. Food shall be stored, prepared and served under sanitary conditions which meet minimum public health standards. Equipment shall be maintained in good working condition. All kitchen employees shall be trained in the handling of food and those who assist in the preparation of food shall receive training in food preparation. Regulations relating to food service will be rigorously enforced.

4. Each inmate who requires a special diet for reasons of health or religion shall be provided a diet to meet his or her individual need.

## VIII. *Correspondence and Visitation*

1. Defendants shall not limit the number or length of letters a prisoner may send or receive. Mail to or from courts, attorneys or other public officials shall be inspected only for contraband, and only in the presence of the prisoner to whom it is addressed or by whom it is mailed. Inspection or censorship of other mail must be in accordance with the standards set forth in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1973). The defendants shall supply postage and paper for up to five letters per week for each inmate.

2. Each institution shall provide a comfortable, sheltered area for visitation. The visiting area must not, except for security purposes that have been documented, physically separate visitors from inmates. Visitation policies must permit an inmate to receive visitors on at least a weekly basis, and rules governing visitation must allow reasonable time and space for each visit. Visitors shall not be subjected to any unreasonable searches. Inmates undergoing initial classification shall not be denied visitation privileges.

IX. *Educational, Vocational, Work and Recreational Opportunities*

1. Each inmate shall be assigned a meaningful job on the basis of the inmate's abilities and interests, and according to institutional needs. Inmates shall not be required or allowed to perform household or personal tasks for any person.

2. Each inmate shall have the opportunity to participate in basic educational programs.

3. Each inmate shall have the opportunity to participate in a vocational training program designed to teach a marketable skill.

4. The defendants may establish reasonable entrance requirements and rational objective criteria for selecting inmates to participate in particular programs. However, no inmate shall be denied educational, vocational and work opportunities except while in isolation for disciplinary reasons or when the participation of an inmate in a particular program presents a clear threat to institutional security.

5. Every inmate, prior to release, shall be afforded the opportunity to participate in some transitional program designed to aid in his or her re-entry into society.

6. Each institution shall employ a qualified full-time recreation director with at least bachelor's level training, or its equivalent, in recreation or physical education. Adequate equipment and facilities shall be provided to offer recreational opportunities to every inmate. Space shall be available for inmates to engage in hobbies. Suitable vocational programs shall be provided.

X. *Physical Facilities*

1. Defendants shall ensure that the physical plant of each facility in the Alabama penal system meets all of the minimum standards of the United States Public Health Service.

(a) Physical facilities in Draper Correctional Center shall meet minimum standards by December 15, 1976. A report setting forth progress in the implementation of this requirement shall be filed 60 days before that date.

(b) Physical facilities in G. K. Fountain Correctional Center shall meet minimum standards by December 15, 1976. A report setting forth progress in the implementation of this requirement shall be filed 60 days before that date.

(c) Physical facilities in Holman Unit Prison shall meet minimum standards by December 15, 1977. A report setting forth progress in the implementation of this requirement shall be filed six months before that date.

(d) Physical facilities in Kilby Corrections Facility shall meet minimum standards by December 15, 1977. A report setting forth progress in the implementation of this requirement shall be filed six months before that date.

2. The defendants shall establish work-release, pre-release, and other community-based facilities to house inmates identified as appropriate for participation in such programs.

XI. *Staff*

1. Qualified staff sufficient to maintain institutional order and to administer programs shall be employed by the defendants, including a total custodial staff at each institution of no less than

| | |
|---|---|
| Draper | 184 |
| Kilby | 171 |
| Fountain | 178 |
| Holman | 159 |

2. Defendants shall provide appropriate and effective training programs for all staff members employed within the Alabama penal system.

3. Defendants shall immediately institute an affirmative hiring program designed to reduce and having the effect of reducing the racial and cultural disparity between the staff and the inmate population.

APPENDIX B

MEMBERSHIP OF THE HUMAN RIGHTS COMMITTEE
FOR THE ALABAMA PRISON SYSTEM

1. Mr. M. R. Nachman, Jr.—Chairman—P.O. Box 668
 Montgomery, Alabama 36101

2. Mr. Oscar W. Adams, Jr. 2121 Building
 Birmingham, Alabama 35203

3. Dr. Mary Catherine Beasley 14 Park Wood
 Tuscaloosa, Alabama 35401

4. Dr. Wiley R. Boyles 3243 Fernway Drive
 Montgomery, Alabama 36111

5. Dr. Fred Campbell 1722 Pine Street
 Montgomery, Alabama 36106

6. Dr. John Murphy Chenault 1115 Somerville Road
 Decatur, Alabama 35610

7. Dr. Nace R. Cohen 750 Washington Avenue
 Montgomery, Alabama 36104

8. Mr. Lee P. Dodd Double Springs, Alabama 35553

9. Mr. William Fasin 1563 Oakland Street
 Montgomery, Alabama 36108

10. Gen. E. M. Friend, Jr. 2030 1st Avenue, North
 Birmingham, Alabama 35203

11. Mrs. Emily B. Gassenheimer 312 Scott Street
 Montgomery, Alabama 36104

12. Dr. Lewis Jones 310 Bulls Street
 Tuskegee, Alabama 36083

13. Dr. Moses W. Jones 244 Monroe Street
 Montgomery, Alabama 36104

14. Dr. J. J. Kirschenfeld 2119 E. South Boulevard
 Montgomery, Alabama 36111

15. Mr. Atley A. Kitchings, Jr. 600 19th Street, North
 Birmingham, Alabama 35203

16. Mr. John L. LeFlore 1504 Chataque Avenue
 Mobile, Alabama 36603

17. Mr. James L. Lovvorn 443 Wright's Mill Road
 Auburn, Alabama 36830

18. Mr. John C. McCluney 3617 Southview Avenue
 Montgomery, Alabama 36111

19. Mr. H. D. McInish P.O. Box 1665
 Dothan, Alabama 36301

20. Mrs. Laurie W. Mandell Route 4, Box 168
 Montgomery, Alabama 36111

21. Col. Floyd T. Mann P.O. Box 295
 Lanett, Alabama 36863

22. Dr. Julius Michaelson P.O. Box 910
 Foley, Alabama 36535

| | | |
|---|---|---|
| 23. | Dr. Alberta Murphy | 13 Hillcrest Drive<br>Tuscaloosa, Alabama 35401 |
| 24. | Mr. James Murry | 101–A Chambless Building<br>Tuskegee Institute, Alabama 36088 |
| 25. | Mrs. Fannie Allen Neal | 2662 Rutland Street<br>Montgomery, Alabama 36108 |
| 26. | Mrs. Otis Owens | 33 Parkside<br>Tuscaloosa, Alabama 35401 |
| 27. | Dr. Julius Pryor, Jr. | 1156 Oak Street<br>Montgomery, Alabama 36104 |
| 28. | Dr. Janet Robbins | Route 2, Box 204–A<br>Ramer, Alabama 36069 |
| 29. | Dr. Paul I. Robinson | 3303 Royal Carriage Drive<br>Montgomery, Alabama 36111 |
| 30. | Mr. Solomon S. Seay, Jr. | 352 Dexter Avenue<br>Montgomery, Alabama 36104 |
| 31. | Mrs. Edward M. Selfe | 3542 Lennox Road, South<br>Birmingham, Alabama 35213 |
| 32. | Mrs. Mary Jo Smiley | 4601 Lawnwood Drive<br>Montgomery, Alabama 36108 |
| 33. | Mrs. Betty Stokes | 801 Montgomery Road<br>Tuskegee Institute, Alabama 36088 |
| 34. | Mr. Thomas W. Thagard, Jr. | 600 Bell Building<br>Montgomery, Alabama 36104 |
| 35. | Ms. Sue Thompson | 2618 Eighth Street<br>Tuscaloosa, Alabama 35401 |
| 36. | Mr. Barney Weeks | 231 West Valley Avenue<br>Birmingham, Alabama 35209 |
| 37. | Rev. Dan C. Whitsett | 2122 Mona Lisa Drive<br>Montgomery, Alabama 36111 |
| 38. | Mrs. Roscoe A. Williams | 621 Alabama Street<br>Montgomery, Alabama 36104 |
| 39. | Rev. Robert W. Wingard | 3151 Woodfern Drive<br>Montgomery, Alabama 36111 |