**ROY BARNES, Plaintiff**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Defendant**

Civil No. 76-191

District Court of the Virgin Islands

Div. of St. Croix

May 20, 1976

123

YOUNG, *Judge*

### MEMORANDUM OPINION WITH ORDER ATTACHED

### I PREFACE

This Memorandum Opinion, as well as the Order which is appended hereto, are being entered under the above and foregoing caption, not as the resolution of inmate Roy Barnes' complaint—that will come later, after a full hearing on the merits of his individual complaint—but for lack of any other appropriate caption for future reference and identification.

### II BACKGROUND COMMENTS

The complex problem of Corrections has received much of this Court's time and concern in recent days. It is a field in which deeper inquiry appears to give rise to only limited understanding and leaves one with the feeling that he has come no closer to a solution. We simply do not know what to do with persons who are convicted of crimes, nor do we appear to know why we are doing whatever we do. If the mark of a civilized society is the manner in which it treats its least fortunate or least acceptable members, then the verdict on our present society falls far short of being truly civilized.

The least pleasant task of the generally rewarding position which I presently hold is that of imposing sentence on a person who has been convicted of a crime. I cannot realistically expect that when that person has served whatever sentence I impose, that he will be any better off for having done it. I agonize over each such decision, wondering if the course I take will simply commit, rather than dissuade, that person to a life of crime. Nor is it likely that society will benefit in any significant sense, regardless of the course I take.

Corrections here in the Virgin Islands takes on added difficulties. We are a small community, but crime is a very major problem. Each crime affects each of us personally, since a friend or a relative is likely to have been a victim, and the crime occurred in a spot we pass by every day. A crime cannot be casually dismissed as just another statistic the way it might be in a large city in the states. Every citizen feels a personal stake in each sentence which is imposed by the Court.

Moreover, our people are composed of many varied ethnic backgrounds, so any local correctional facility will necessarily have a mixed composition. These groups have different outlooks on life. Whatever values have been instilled and whatever training acquired, have been achieved through means of education and upbringing which vary between the groups, and which certainly differ from the traditional stateside child-rearing process. Rehabilitation, if ever a realistic possibility, could never be achieved by treating all inmates in a like manner. It would take an extremely sophisticated correctional system to achieve the supposed goals of corrections here in the Virgin Islands.

Beyond this, we are a small island community with limited resources. It is economically infeasible to have all

the special services, which a correctional facility requires, to serve a 120-person institution. Yet geography precludes us from drawing on larger surrounding communities for these services in a way that a stateside institution might do. This Court is well aware of the problems facing those persons who must attempt to operate a correctional system here in the Virgin Islands.

On the other hand, there are special advantages of our situation which should make the task of corrections somewhat easier than it might be elsewhere. The size of our community enables inmates to maintain close contact with their families and friends, thus making their re-entry into society less difficult. Our tropical climate should permit inmates to spend much longer hours outside engaged in work and recreation than their stateside counterparts, thus contributing to a healthful attitude and alleviating some of the frustration of confinement.

We are fortunate to have a new physical facility here on St. Croix in which to keep the inmates. Few physical plant improvements are needed. We are additionally advantaged in that the problems of drugs, gambling, and homosexuality do not exist on as large a scale as is the situation in stateside prisons. In short we have the potential for a local community treatment center of a type which few places in the states could have. It may be unrealistic to expect that we will ever be adequately equipped to handle certain classes of inmates who require special attention, but this should not mean that we cannot operate a correctional facility at all.

### III THE COURT'S INVOLVEMENT

Preliminarily, some explanation is needed as to how and why this Court has recently become actively involved in the correctional system in St. Croix. During my tenure as a

federal judge I have sent many persons to our local correctional facility, formerly the Richmond Penitentiary, and more recently, the Golden Grove Adult Correctional Facility. Time and time again I have seen these same men return to Court and then to prison. It seemed that no one, neither the man nor society, had benefited from the earlier prison experience, unless society only hoped to buy a brief respite from the wrath of this particular individual's wrongdoing for its rather substantial expenditure of tax dollars. It is clear that society was not receiving a return on its investment in terms of a decreased likelihood of the commission of future crimes.

At the same time I was receiving petition after petition from the men I had sent to these institutions, raising multifarious complaints as to the conditions and treatment therein. The sameness of these complaints seemed to be at least some indicia of their validity. I handled each petition as best I could in piecemeal fashion. It has always been quite difficult to obtain any reliable information as to the actual state of affairs at the institution. Moreover, even when relief seemed warranted in terms of a change in operation of the institution and a factual basis was established threfor, I was reluctant to intervene because of the jurisdictional questions involved.

### IV THE COURT'S COMMISSION

Recently, on March 31, 1976, as a result of increased filings of civil rights actions by inmates and reports of a potentially riotous situation at the prison, I appointed an independent five person commission, composed of three citizens and two inmates, to investigate the correctional facility and all phrases of its operation and to submit findings and recommendations to the Court. After an extensive investigation, the Commission completed its work on May 1, 1976 by submitting to the Court a carefully prepared,

thoroughly documented final report stating its findings and recommendations. I adopt the findings of the Commission as my own, except insofar as criminal conduct on the part of any person is alleged, since any such allegations have not been established by an appropriately high standard and because any such persons have not had a sufficient opportunity to respond. Moreover, the adoption of said findings by the Court shall be subject to a contrary showing at the hearing provided for below.

Furthermore, I fully concur with nearly all the recommendations made by the Commission and I heartily recommend their implementation. Many will not be addressed herein, however, as not being properly within this Court's concern.

The primary recommendation made by the Commission called for the removal of the two top prison officials, the Acting Warden and the Acting Captain, from the acting capacities in which they are presently serving. This recommendation was in the Commission's words "the one most important recommendation it can make to the Court." On May 5, 1976, I issued an order to the responsible government officials, noting this Court's "strong recommendation" that immediate action be taken to effect the removal of these individuals from their present acting capacities. No action, not even a response, has been taken on this recommendation, nor is there any indication that action will be taken.

## V THE MINIMUM STANDARDS OF INCARCERATION

The minimum standards which the Court sets down today must be met whether or not the aforesaid recommendation is acted upon. I fully concur with the Commission's belief, however, that the success of all other recommendations is dependent upon the immediate and effective

discharge of this recommendation. Accordingly, as the Order appended hereto shall indicate, should this primary recommendation not be carried out in accordance with this Order and the time limitation contained therein, the sanctions discussed below shall take effect.

By having become involved in the situation presently existing at our prison, I do not mean to profess any special competence to deal with the monumental problems which confront corrections people. I readily disclaim any such notion. If anything, my recent involvement has given me a greater appreciation of the nearly insoluble problems confronting these people. This Court is ill-equipped to handle the day-to-day problems of a penal system.

Moreover, even if I did have some special expertise, which I clearly do not, it would not be within the proper sphere of this Court's functions to involve itself in the operation of a penal system. This a proper limitation on the judicial realm.

This needed restraint is cogently described by Justice Powell in Procunier v. Martinez, 416 U.S. 396, 404–05 (1974) where he wrote:

Traditionally, federal courts have adopted a broad hands-off attitude towards problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly

134

within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities. (Footnotes omitted.)

 I fully recognize and concur with this proper limitation on judicial authority and function. When the conditions existing in our prisons, however, rise to the level of constitutional deprivations, I would be abdicating my solemn responsibility as a federal judge, to uphold the Constitution and the rights of all citizens thereunder, should I sit idly by and fail to act. This Court will not countenance wholesale deprivations of the constitutional rights of any of our citizens, however undesirable they may be, under the guise of judicial restraint. In Procunier v. Martinez, supra, Justice Powell was equally eloquent in explaining this more active role:

But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights. 416 U.S. at 405–06.

The point at which federal courts can no longer refuse to act in the name of judicial restraint is aptly delineated in a comprehensive opinion on the subject of prison reform recently delivered by Chief Judge Frank Johnson of the Middle District of Alabama. In James v. Wallace, 406 F.Supp. 318, 328 (M.D. Ala. 1976) he wrote:

While this Court continues to recognize the broad discretion required for prison officials to maintain orderly and secure institutions, . . . constitutional deprivations of the magnitude presented here simply cannot be countenanced, and this Court is under a duty to, and will, intervene to protect incarcerated citizens from such

wholesale infringements of their constitutional rights. (Citations omitted.)

It is with this balance in mind that I write today.

I am fully aware of the many countervailing considerations as I assume the role of being a protector of prisoners' rights. Prisoners are not to be coddled. They necessarily give up certain rights as a result of being incarcerated. For each right or privilege they are granted, there should be a correspondent responsibility. Inmates can and should be required to complete certain tasks each day. Prison officials have a duty to maintain the order and security of their institutions.

I am in complete sympathy with the victims of the scourge of senseless crimes which has troubled these islands in recent years. We are all victims in the sense that the quality of life is diminished by living in a community where crime is the rule, rather than the exception. I recognize this Court's duty in exercising its sentencing function to consider the potential future victims of crime in fashioning a sentence that will deter both the sentenced offender and others.

No one gains, however, by sending an individual who is already alienated from society to a place which will only serve to enhance his hostility. Nearly all of the inmates at Golden Grove will be returning to society, the majority in a rather short period of time. It makes no sense to incarcerate these persons under conditions which qualify them to be nothing other than repeat offenders.

A convicted person is not sent to a penal institution to receive additional punishment. Primitive though our attempts at correcting anti-social behavior may be, we have advanced beyond the notion that beatings and physical deprivations will make an individual more "socialized". The fact of incarceration is the punishment. No one can

136

reasonably contend that the "loss of liberty" involved in being incarcerated is not a substantial deprivation, regardless of the conditions under which the person is held.

■ In Pell v. Procunier, 417 U.S. 817 (1974) the Supreme Court announced the legitimate goals and policies of a corrections system. Justice Stewart wrote:

An important function of the corrections system is the deterrence of crime. The premise is that by confining offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses. This isolation, of course, also serves a protective function by quarantining criminal offenders for a given period of time while, it is hoped, the rehabilitative processes of the corrections system work to correct the offender's demonstrated criminal proclivity. Thus, since most offenders will eventually return to society, another paramount objective of the corrections system is the rehabilitation of those committed to its custody. Finally, central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves. 417 U.S. at 822–23.

Justice Stewart added the important caveat that, "It is in light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners." The Court, then, must attempt to strike a balance between the goals of deterrence, both specific and general, rehabilitation, and internal security of the institution. This Court may not order implementation of rehabilitation programs without regard to the security of the institution. Likewise, prison officials may not deny implementation of the same in the name of security alone.

## VI CONSTITUTIONAL CONSIDERATION

■ The Eighth Amendment's prohibition against cruel and unusual punishment has provided the basis for many recent judicial decrees setting down minimum standards

for prisons and ordering compliance therewith. See, e.g., James v. Wallace, 406 F.Supp. 318 (M.D. Ala. 1976); Jones v. Wittenberg, 330 F.Supp. 707 (N.D. Ohio 1971); Holt v. Sarver, 309 F.Supp. 363 (E.D. Ark. 1970), aff'd 442 F.2d 304 (8th Cir. 1971). It is a well-established principle that the content of the Eighth Amendment is not static but "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S. 86, 101 (1958). Another court has said with respect to the term "cruel and unusual punishment", "It is flexible and tends to broaden as society tends to pay more regard to human decency and dignity and becomes, or likes to think that it becomes, more humane." Holt v. Sarver, supra, at 380. While any single prison condition may not constitute cruel and unusual punishment, the totality of the conditions of incarceration may impermissibly contravene the Eighth Amendment's requirements.

██ Prisoners are also protected by the Due Process and Equal Protection clauses. Washington v. Lee, 263 F.Supp. 327 (M.D. Ala. 1966), aff'd per curiam, 390 U.S. 333 (1968). This protects them from arbitrary and capricious treatment by prison officials. See James v. Wallace, supra. The First Amendment provides another constitutional basis upon which prison regulations and practices have been invalidated. See Procunier v. Martinez, supra; Pell v. Procunier, supra. As Chief Judge Johnson wrote in James v. Wallace, supra, "There has been growing recognition by the courts that prisoners retain all rights enjoyed by free citizens except those necessarily lost as an incident of confinement." 406 F.Supp. at 328. It is these fundamental constitutional safeguards, which a person retains even though incarcerated, that I seek to protect today.

I shall not attempt to review each specific finding and then establish a constitutional basis for each corresponding minimum standard which I shall announce. Instead, I will discuss several general principles which I believe will cover the vast majority of the constitutional infringements presently obtaining at the Golden Grove facility. The first and major area of concern is the question of an inmate's right to be rehabilitated.

The Courts have not yet found a constitutional right on the part of prisoners to be rehabilitated. Even so, the court in James v. Wallace, supra, would not countenance a program which was counterproductive to an inmate's attempted rehabilitation. The court wrote:

> While courts have thus far declined to elevate a positive rehabilitation program to the level of a constitutional right, it is clear that a penal system cannot be operated in such a manner that it impedes an inmate's ability to attempt rehabilitation, or simply to avoid physical, mental or social deterioration. 406 F.Supp. at 330.

This same additude was reflected by the court in Holt v. Sarver, supra, where it was written:

> The absence of an affirmative program of training and rehabilitation may have constitutional significance where in the absence of such a program conditions and practices exist which actually militate against reform and rehabilitation. 309 F.Supp. at 379.

■ ■ It makes absolutely no sense to confine a person under conditions which increase the likelihood of future confinement. The court in James v. Wallace held that to do so constitutes cruel and unusual punishment. 406 F.Supp. at 330. Such conditions stand in direct derogation of the goal of rehabilitation which the Supreme Court set down in Pell v. Procunier, supra. The educational, vocational, recreational, and work opportunities which do exist must be made available on an equal basis to all inmates. James v. Wallace, supra.

139

It is no understatement to say that there is no rehabilitation taking place at St. Croix's correctional facility. With the exception of a discriminatorily assigned work release program there are no meaningful work opportunities for the inmates. Inmates are not being taught marketable skills so that they might have some chance of "making it" upon their release. Basic education courses are not being provided despite available volunteer resources. Recreational opportunities are very limited and haphazard, there being no organized activities.

I have had far too much experience with habitual offenders to adopt some naive view that prison can reform all or even a large majority of convicted criminals. There is much merit to the question posed by a California inmate who said, "How you gonna rehabilitate me, man, when I ain't never been habilitated?" This does not mean that our prisons do not have to provide reasonable opportunities for those who may wish to make a better life upon their return to society. At a bare minimum we should not permit prison officials to stifle the efforts of those who do wish to reform.

■ Corrections officials may not simply ignore rehabilitational measures for the sake of having a smoothly run institution. Though having inmates spend their days in a state of institutionally induced numb lethargy may make the task of corrections officials much easier, this cannot pass constitutional muster if rehabilitation is to have any meaning as a viable goal of a corrections system. We do little to help the persons whom we imprison by permitting them to spend day after day sitting around in the tropical sun.

It clearly lies within everyone's self-interest to try to rehabilitate convicts. Surely, society must be hoping to purchase something more for the high cost of incarceration

than merely to be protected from the offender during his period of confinement. The formula is a simple one. In Holt v. Sarver, supra, the court stated:

If a man who is ignorant and unskilled when he goes into prison can come out with some education and some usable skill, he has an improved chance of staying out of prison in the future. If he comes out as ignorant and unskilled as he goes in, recidivism on his part is almost inevitable. 309 F.Supp. at 379.

 The findings indicate a total lack of initiative and imagination on the part of the prison administration. Many of the recommendations made by the Commission involve a negligible expenditure of funds. Some programs may even lower the costs, such as expansion of the prison's agriculture program which would thereby lower food costs. Though it is not for me to recommend specific programs, I shall order the provision of meaningful rehabilitational opportunities within a reasonable time for all inmates, failing which I shall sentence all offenders to mainland institutions.

Many times previously I have strongly recommended that persons whom I have sentenced be sent to mainland correctional facilities. I have done so with the recognition that the much larger mainland institutions can naturally be expected to have a much greater quantity and much wider variety of rehabilitational opportunities. These requests have been repeatedly ignored by the responsible government officials. They have done so with the explanation that it costs more to maintain a Virgin Islands prisoner in a stateside institution than it does to keep him in our local facility.

My answer to this is two-pronged. From all indications, including the budgetary figures provided by the local government, it is far less expensive to send and keep a man in the states than it is to keep him at Golden Grove.

141.

 My second response is that the government cannot say that we do not have funds to provide rehabilitational opportunities for the inmates at the local institution, and we cannot afford to send the inmates to stateside institutions where programs are available because it costs more than our local prison. Inadequate funding is not a legitimate excuse when constitutional rights are being bought. This was made resoundingly clear in Hamilton v. Love, 328 F.Supp. 1182, 1194 (E.D. Ark. 1971) where the court said with respect to detention of persons prior to trial:

> Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights. If the state cannot obtain the resources to detain persons awaiting trial in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons.

I am not convinced that this community should even attempt to run its own corrections system. Though we do have the advantages which I spoke about above, perhaps it is too much to expect for a community of this size to have available all the specialized services which are required when the institution being served maintains not many more than 100 persons. But this government has made a decision to operate a penitentiary system. Having made that decision it must be operated in accordance with the Constitution.

### VII CERTAIN INADEQUACIES OF GOLDEN GROVE

 I turn now to discuss the other general principles upon which I am basing this Memorandum Opinion and Order. Many of the inmates' complaints through the years and many of the established inadequacies relate to such items as food and medical care. I believe that the institution's obligations in this regard are very simply

stated. One of the most fundamental responsibilities of any correctional institution is to provide basic care for the persons committed to it. Since the state is denying incarcerated persons the right to seek needed care on their own, the state must assume the burden of assuring access to quality medical care.

 I find glaring deficiencies at the Golden Grove facility in the areas of medical, dental and psychiatric care. The report of the Corrections Task Force of the National Advisory Commission on Criminal Justice Standards and Goals makes some important statements with respect to medical care which I wholly adopt. The Commentary states unequivocally that "offenders do not give up their rights to bodily integrity whether from human or natural forces because they were convicted of a crime." The report is premised on the notion that the medical care should be comparable in quality and availability to that obtainable by the general public. The state's responsibility is clearly a broad one. "It extends beyond treatment of injuries and disease to include preventive medicine and dentistry, corrective or restorative medicine, mental as well as physical health."

In Newman v. Alabama, 349 F.Supp. 278 (M.D. Ala. 1972) a court held that failure to provide sufficient medical facilities and staff to afford inmates basic elements of adequate medical care constitutes a willful violation of prisoners' Eighth and Fourteenth Amendment rights.

 The provisions at Golden Grove with respect to mental health care are grossly inadequate. The generously donated services of a volunteer psychiatrist are no longer available. Despite Commission estimates that approximately one-half of the inmates require some such psychiatric help, there is presently none available. Nor is there any type of alcohol and drug rehabilitation program despite the

143

prevalency of these problems in these islands and the significant correlation between alcohol and drug use and crime.

■ The state has an equally high burden to see that inmates at a correctional institution are provided with an adequate diet. The major food issue regarding our correctional facility is whether it is required to make special dietary provisions to accommodate certain religious groups. This issue was discussed at length in Barnett v. Rodgers, 410 F.2d 995 (D.C. Cir. 1969), where Muslim inmates, citing their faith's proscription against the consumption of pork, brought an action based on the Free Exercise Clause of the First Amendment, complaining that prison authorities had denied their request to be fed at least one full-course, pork-free diet daily and coffee three times a day.

The court stated that where governmental authority impairs a prisoner's ability to practice religious beliefs, the state must demonstrate a compelling state interest in the regulation of a subject which it is entitled to regulate and that the governmental purpose cannot be more narrowly achieved. Based on the record before it the court was unable to decide whether this showing could be made, but the court's opinion seemed to indicate that prison officials must make reasonable efforts to accommodate dietary restrictions of religious groups. The court wrote:

Appellants do not seek, either for themselves or other Muslims, a full menu tailored specially to their religious beliefs. Their request for "one full-course pork-free diet once a day and coffee three times daily" is essentially a plea for a modest degree of official deference to their religious obligations. Certainly if this concession is feasible from the standpoint of prison management, it represents the bare minimum that jail authorities, with or without specific request, are constitutionally required to do, not only for Muslims but indeed for any group of inmates with religious restrictions on diet. But we are not told why appellee could not equally accommodate, to some extent

at least, appellants' supplication and the needs of any other such group as well. 410 F.2d at 1001–02.

The court suggested that the advance publication of menus with designations as to the pork content of each item, and the spacing of such items to scatter them as far as possible, would at least reduce the area of constitutional concern. I find that very little effort has been made by the institution to meet the special dietary requirements of such groups as the Muslims and the Rastafarians.

 Other important areas of inmate concern are visitation rights and mail censorship. Visitation from family and friends is an integral part of the process of rehabilitation. Visits are a very important part of an inmate's week. The anticipation contributes to a healthful attitude. Any restrictions imposed by the prison's visitation regulations must be reasonably related to some valid penal objective. James v. Wallace, supra, at 330. I believe that the existing visitation rights at Golden Grove should be expanded and made more flexible. The visitation hours should be less rigidly enforced in the special case of visitors who for valid reasons cannot visit at the prescribed hours. Visitors should not be discouraged by being forced to visit in uncomfortable surroundings. Prison officials should take advantage of reforms such as increased visitation which constitute good therapy but do not require an undue amount of effort on their part.

 The ability to freely receive and send mail is another important aspect of prison life. I shall not review the law on this subject since it is comprehensively covered in the recent Supreme Court opinion of Procunier v. Martinez, 416 U.S. 396 (1974). Any mail censorship regulations must henceforth comply with the dictates of that decision. It is important to consider that items or activities which may constitute a relatively insignificant

part of a free person's routine take on enhanced importance when a person is incarcerated. The difference between a smoothly run institution and one continually bordering on the edge of a riot can be simply the attention given to these small details.

 The problem of prison discipline and internal security frequently becomes an area of constitutional concern. The Due Process and Equal Protection clauses protect prisoners against arbitrary, capricious, and unequal treatment. I find constitutional deficiencies in these areas as well.

 The most serious of these arises from the simple fact that the prisoners are not given a copy of the institution's rules and regulations upon their admittance to the facility. They are dependent upon veteran prisoners and isolated posted notices if they wish to have any advance determination of their rights and responsibilities. Otherwise, they must wait until they have committed a violation before they are informed. Even then they may not be told because inmates are sometimes "locked-down" for several days before a "hearing" is held. The hearing, if held, is more often than not a mere token deference to due process requirements. Discipline at the prison is administered unevenly and rarely in a fashion that comports with due process.

 The failure to inform new prisoners of the institution's rules brings to mind another glaring deficiency. There is no established inmate classification procedure. No attempt is made to learn anything about the new inmate, his skills, background, or psychological difficulties. It is impossible to design a rational rehabilitation program for an inmate in the absence of a workable classification procedure.

## VIII THE COURT'S AUTHORITY AND POWER

This completes an overview of most of the existing constitutional deficiencies at the facility. The minimum requirements laid down in the Order which is appended hereto derive from the findings, general principles, and constitutional requirements discussed herein. The operation of the Order shall be suspended for 20 days from the date of the Order during which time the government shall be given an opportunity to show cause why the findings of the Commission should not be adopted as the findings of this Court and why the implementation of the minimum requirements announced today should not be mandated. Failing any showing to the Court's satisfaction, the Order shall take immediate effect upon the expiration of 20 days. Once the Order has taken effect, the standards must be met within the timetable contained therein or the Court shall take the steps discussed below.

 Many federal courts have issued wide-ranging decrees mandating prison reforms when constitutional deprivations have been found. See, e.g., Hamilton v. Landrieu, 351 F.Supp. 549 (E.D. La. 1972); James v. Wallace, supra; Jones v. Wittenberg, supra; Holt v. Sarver, supra. The strength of the language contained in these orders suggests the breadth of a federal court's authority to intervene when unconstitutional conditions exist in a penal institution. In Holt v. Sarver, the Court wrote:

> Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States. 309 F.Supp. at 385.

In James v. Wallace the Court said:

> The Court now acts in these cases with a recognition that prisoners are not to be coddled, and prisons are not to be operated as hotels or country clubs. However, this does not mean that responsible state officials, including the Alabama Legislature, can be allowed to operate prison facilities that are barbaric and inhumane. Let the defendant state officials be placed on notice that failure to comply with the minimum standards set forth in the order of this Court filed with this opinion will necessitate the closing of those several prison facilities herein found to be unfit for human confinement. 406 F.Supp. at 331.

It is clear that a federal court can and must act when infringements of the kind established here exist.

This brings me to a discussion of the options available to the Court should the responsible officials fail to meet the standards announced today within the timetable contained herein. My control is limited to that which can be effected by exercising my discretion over the sentencing function. If this Court feels at the expiration of the timetables contained in the Order that the responsible officials have not made reasonable good faith efforts to comply with the Order and have not in fact substantially met the standards, then I shall drastically alter my sentencing policies. This does not mean that dangerous criminals will be set free to walk the streets.

My principle action would be to recommend that all sentenced offenders be sent to mainland institutions for incarceration. This would include all future offenders and inmates sentenced within the past 120 days over whom I still retain jurisdiction. Since I can only recommend and not order where a sentenced offender shall be incarcerated, I cannot judicially insist that my recommended incarceration be followed by the executive branch of the government.

Thus, as a last resort, I may be forced to take more drastic action in an area where I not only have the authority,

but the power. At that point, continued noncompliance with the orders of this Court will force me to refuse to incarcerate all nondangerous offenders. Moreover, I will resentence and set free all nondangerous persons who had been sentenced within the prior 120 days. Additionally I may refuse to detain any nondangerous persons pending trial whether or not I believe they will show up for trial. Effectively, I will close down the Golden Grove Adult Correctional Facility as long as it continues to operate with apparent disregard for the constitutional rights of the persons incarcerated therein. Beyond this, I may initiate proceedings to determine whether any individuals in administrative government capacities should be held in contempt of this Court.

## IX CLOSING REMARKS

In closing I wish to indicate my personal feelings in this matter of grave concern. I would have preferred our prison never to have reached a situation where this Court is constitutionally obligated to become involved. Even then I am extremely reluctant to interfere. I have great reverence for the separation of powers doctrine. I have always attempted to exercise great caution not to act outside the judicial sphere. My greatest fear now is that the real issue, the prison, will be lost in some embroiled controversy over separation of the powers. I am hopeful the other government officials will not hide behind this subsidiary issue and ignore their responsibility to consider the problems of the prison.

If we had a constitutionally adequate prison in St. Croix, I would, of course, leave the problems of its operation to the responsible officials, where they should properly be. If local officials had advised me that the Virgin Islands government is economically and otherwise unable to run a prison which accords with constitutional dictates, I would

be satisfied to have all sentenced offenders sent to mainland institutions. This, unfortunately, was not the case.

Even after the facts were in and the urgency of the situation at the prison became known, the preferred course would have been for the Court to pass the information on to the responsible individuals, and simply wait for them to take the needed action. This was the course pursued by the Court in the spirit of cooperation, but to no avail, as the officials have refused to act.

At this point the Court can no longer refrain from acting. I will not be a partner with other government officials in the apparent disregard for the constitutional rights of these inmates. This Court will not ignore its sworn duty to protect the constitutional rights of all citizens. I issue the following Order with the highest respect for the other branches of government, but with the deepest concern for the situation at hand. I am still hopeful that others will cooperate in seeing that the changes needed to meet these standards are implemented.

This Court will not shy away in the face of charges of judicial activism when it acts to protect the fundamental constitutional rights of the persons protected thereby. When we consent to the disparagement of the constitutional rights of any citizen, no matter how unacceptable that person may be in the eyes of society, whether affirmatively or through implication by inaction, then it becomes easier and easier to compromise those rights in the future when it comes to other classes of persons whom we may not care for. The strength of our constitutional guarantees can be measured by the protection which they afford to our weakest member. By denying them to some, they have less meaning for us all.

## X ACKNOWLEDGMENT AND CREDITS

Having closed this lengthy Memorandum Opinion, I now

wish to acknowledge with a great sense of appreciation, the work of the Commission whose members so diligently and dedicatingly worked, without compensation, throughout several weeks, several weekends and well beyond normal daily working hours. The Virgin Islands is indeed indebted for the valuable investigative work of these Commissioners, to wit: Dr. Leonard Cohen, Chairman, J. P. Hendrick, Melville Stevens, Esq., Edwin Callwood and Israel Miranda. I would also be woefully ungrateful were I not to include in this expression of gratitude and credit the work of my law clerk, Gary Dixon, a recent honor graduate of the University of Virginia Law School, in his extensive research, in advising and counseling the Commission and myself and in drafting this Memorandum Opinion.

## ORDER

In accordance with the Memorandum Opinion of even date herewith to which this Order is attached and for the reasons set forth therein, it is hereby

█ RECOMMENDED that the two persons temporarily serving in the capacities of Acting Warden and Acting Captain shall be removed from their present acting capacities within ten (10) days from the date of this Order. The Commissioner of Public Safety has been notified of this single most important recommendation of the Commission since April 20, 1976, and in the Court's opinion, has already had ample time within which either to accept and act upon the recommendation or to show to the Court why the recommendation should not be or cannot be accepted. If this recommendation is not accepted and acted upon within ten (10) days from the date hereof, I will refuse to send any more convicted defendants to the Golden Grove Adult Correctional Facility but will order their incarceration elsewhere. I may also order convicted

defendants who have been sentenced within the past 120 days, to continue to be incarcerated but at other prison-like institutions. The Commissioner of Public Safety shall replace those acting in the Acting Warden and Acting Captain capacities by those persons named in Item Number 40 of the Commission's Report or by retaining other persons who shall by education, training and prior experience qualify as professional penologists.

And it is further ORDERED that the following minimum standards of incarceration of inmates and detainees at Golden Grove Adult Correctional Facility must be met within the prepared timetable whether or not the aforementioned recommendation as to the Acting Warden and Acting Captain is accepted and acted upon.

## I STAFF

1. Qualified staff sufficient to maintain institutional order and to administer programs shall be employed. Except for the employment of a few specialists as indicated herein, the number of staff presently employed should be adequate to meet the needs of the institution, assuming absenteeism rates return to a more normal level.

2. Recruitment standards related to the job requirements shall be developed and adhered to. Psychological testing should be utilized with all job applicants and present staff to determine the individual's fitness to be employed as a corrections officer.

3. Appropriate and effective training programs shall be provided for all staff members employed within the institution. This should include pre-service training and in-service training on a regular basis. The Court recommends that the Federal Bureau of Prisons Training Materials for Jail Administrators (Lieutenants and up) and Jail Officers (Sergeant and down) should be used for this purpose.

4. Job incentives must be developed so that the staff will be motivated to develop professionally.

5. An adequate staff manual, related to the job requirements, must be developed and distributed to all staff members. Regular staff meetings should be held to assure greater access to the administration and greater imput into the policies and practices of the institution.

## II INMATE RULE AND DISCIPLINE

■ 1. The rules and regulations of the institution relating to inmates shall be clearly established within thirty (30) days. A manual containing these rules and regulations, as well as an inmate's responsibilities, rights, and privileges, shall be developed and given to each prisoner upon commitment to the institution. The staff should review this manual with the inmates on a regular basis.

2. Inmate rules violations that can lead to administrative punishment must be handled in compliance with the due process requirements as set forth in Wolff v. McDonnell, 418 U.S. 539 (1974). A prisoner should not be "locked-down" prior to the hearing unless a preliminary meeting with a prison official immediately after the violation establishes a need therefor. If a prisoner is "locked-down" before the hearing, a hearing must be held within 24 hours unless the inmate wishes a longer time to prepare.

3. An Inmate Advisory Committee should be established to provide inmate representation through an orderly process in all phases of the institution's operation. If effectively utilized, this group can form a liaison between the inmates and the staff and administration, whereby the inmates will have a greater awareness of the administration's problems and motives, and vice versa.

## III INMATE CLASSIFICATION PROCEDURE

██ 1. Within sixty (60) days there must be developed a formal classification and diagnostic procedure for each inmate at intake. There shall also be a full orientation program for each new prisoner. This inmate classification procedure is absolutely necessary if effective rehabilitation is to take place.

2. The classification program shall be utilized to determine the vocational, educational, recreational, religious, and work needs of each new inmate. The physical and mental health care requirements of each prisoner shall be identified. Any other basic care needs should be discovered and noted.

3. The purposes of such a program are manyfold. It will enable the institution to identify the special needs of the inmate and enhance the likelihood of successful rehabilitation. It provides a method for identifying individuals who because of mental or physical infirmities may require transfer to a more appropriate facility, or who may require special treatment within the institution. It also establishes a method whereby those individuals who are suited for work release or perhaps for participation in some diversionary alternative can be identified.

4. Pre-sentence reports should be made available to the institution and utilized as an aid in this process.

5. The classification of each inmate shall be reviewed at least annually.

6. The Commission recommended the use of Fort Christian for purposes of intake and classification because of its closer proximity to more professionals. Whether this recommendation is followed is discretionary, but it is mandatory that a formal inmate classification system be developed to serve Golden Grove.

154

## IV REHABILITATION

1. Each inmate shall be assigned a meaningful job based on his abilities and interests, and according to institutional needs. This may include work which can be done outside the institution under supervision.

2. Each inmate shall have the opportunity to participate in basic educational programs. The practice of using volunteers from the community is to be encouraged, and it is suggested that a liaison with the college be established whereby some of its students could be utilized as teachers. The use of educated inmates as teachers, as long as it is done in an organized fashion, is also recommended.

3. Each inmate shall be given the opportunity to participate in recreation activities at least one hour per day, five days a week. A staff member, preferably with training in recreation or physical education, shall be assigned to organize the recreation program. Adequate equipment and facilities shall be provided to offer recreational opportunities to every inmate. It is encouraged that athletic teams from the outside be brought in to participate in contests and that inmates be taken into the community for the same.

4. Every inmate must be given a full opportunity to practice his religion consistent with the institution's need to maintain order. An office shall be set aside whereby volunteer ministers can confer with inmates.

5. Within sixty (60) days the institution shall see that each inmate is provided with a meaningful rehabilitational opportunity which will prepare him to return to society. This requirement may be satisfied by providing the inmate with an opportunity to participate in a work-release program, a college-release program, or a vocational training program which teaches a marketable skill, either inside or outside the facility.

6. Three of the categories listed in Part IV, 5 require release from the institution during the day. For those inmates whose release into the community cannot be justified or legally granted, the institution will simply have to supply a sufficient number of vocational opportunities within the institution. The possibilities are too numerous to mention. Expansion of the agriculture and fishing program, cooking, auto mechanics, electronics taught at the institution or through a correspondence course, boat repair, and reinstitution of the arts and craft program are just a few of these possibilities.

7. Pre-trial detainees shall be eligible to participate in any of the rehabilitation programs. Aside from the minimal tasks required to maintain their personal surroundings, however, they shall not be required to participate in any such programs.

8. The system for handling prisoners' pay shall be amended forthwith. A "bank" shall be set up and every inmate shall be given a running sheet showing his balance and each deposit or withdrawal. The inmate shall also be given a separate receipt for each deposit. Each inmate shall be entitled to receive one-half of his monthly payments instead of accumulating all until the time of release.

9. Work release privileges shall be evenly granted. Within thirty (30) days the Acting Warden shall develop a written set of standards upon which the recommendations for work release shall be determined. When an inmate applies to the Warden for a recommendation for work release, and the same is denied, the inmate shall be given a written statement of reasons for the denial. A work release report shall be required from each participating employer each month and these shall be reviewed by the prison administration.

10. The library shall maintain an adequate supply of acceptable reading materials for all inmates, both in English and Spanish. This shall include a current set of the Virgin Islands Code, with the most recent supplements. The Court will make an effort to donate older legal volumes which have been replaced to the prison.

### V VISITATION AND MAIL PRIVILEGE

1. In view of the substantial contribution which visits from family and friends can make to the emotional growth of an inmate, the present regulations permitting visitors at the facility three afternoons a week for a two-hour period shall be expanded by adding a fourth two-hour visitation period during one evening a week. This will help to accommodate families and friends who have difficulties visiting during the afternoon. The visiting regulations should be more flexible to meet special cases. The regulations regarding visits by children of inmates should be revised to provide for increased opportunities.

2. Immediate improvements should be made in the visiting area. More chairs should be provided in the visiting area. Forcing visitors to stand will discourage many from coming to the facility. The picnic area should be expanded so that families can enjoy a meal together.

3. There shall be no limitation on the number or the length of letters a prisoner may receive. Mail to or from courts, attorneys, and public officials shall be inspected only for contraband and only in the presence of the prisoner to whom or by whom it is sent. Procunier v. Martinez, 426 U.S. 396 (1974) governs the inspection and censorship of any other mail.

### VI FOOD

1. Every inmate is entitled to three wholesome and nutritious meals per day.

2. Within thirty (30) days a dietician shall be employed on a part-time or consultant basis to assist in menu planning, methods of food preparation, purchasing standards and sanitation.

3. Food must be handled and prepared under conditions which meet the minimum public health standards.

4. Reasonable efforts shall be made forthwith to accommodate special dietary needs of inmates which are required for reasons of health or religion. Menus shall be published in advance for each meal indicating the contents of each item to be served. Items which a significant number of inmates are unable to eat shall be eliminated or, at least, scattered apart as much as possible.

5. The procedure set forth in the preliminary injunction issued by this Court in an Order dated May 14, 1976, shall govern the bringing of food into the facility by visitors until further action is taken amending said Order.

6. It is strongly recommended that the services of the commissary be largely expanded. It is further recommended that the commissary should be run by the inmates and its books should be open to inspection by inmates and staff.

### VII MEDICAL, DENTAL, AND PSYCHIATRIC CARE

1. Medical care must be comparable in quality and availability to that obtainable by the general public. It extends beyond treatment of injuries and disease to include medicine and dentistry, corrective or restorative medicine, mental as well as physical health.

2. The physician should maintain regular hours which are known to the inmates. A physician must be available on call at all times.

3. Emergency medical treatment should be available on a 24-hour basis.

4. As part of each prisoner's intake and classification a thorough medical examination should be given.

5. Medical services should be performed only by persons with appropriate training under the supervision of a licensed physician. The prescription and dispensing of medication should be under strict medical supervision.

6. Complete and accurate medical records should be maintained under the physician in charge. Whenever an inmate is involved in a situation with another inmate or staff member which requires medical attention, a complete record of his physical condition shall be made at the time.

7. Medical problems requiring special diagnosis, services or equipment should be met by medical furloughs or purchased services. Prisoners with special medical problems which cannot adequately be handled on a regular basis should be transferred to a facility which is equipped to treat these problems.

8. The part-time services of a dentist must be available on call. Inmates are entitled to both curative and preventive dental work.

9. Within sixty (60) days arrangements shall be made to ensure the presence of a psychiatrist at the facility at least one day a week, whether on a volunteer or contractual basis.

10. In addition to other duties the psychiatrist will be responsible for the training of a psychiatric aid who will be a permanent staff member. The psychiatrist shall also develop an education program whereby the staff can learn to work with inmates having mental health problems.

11. A mental status examination should be given as part of the intake and classification procedure. If at that time or any time subsequent thereto, the psychiatrist believes that proper mental health care cannot be provided for the

inmate at the facility, the inmate shall be transferred to an institution which is adequate to deal with his problems.

12. Arrangements shall be made to introduce an alcohol and drug rehabilitation program. Otherwise, inmates who are in need of such treatment, in the opinion of the psychiatrist, shall be transferred to an appropriate institution.

## VIII PRE-TRIAL DETAINEES

1. Prisoners awaiting trial shall be effectively separated from the sentenced offenders. If physically possible, they should be housed in separate buildings.

2. Detainees shall be eligible to participate in any of the programs available to sentenced offenders, but shall not be required to do any work except to keep their cell area in a sanitary condition.

3. Detainees shall be held at the institution under the least restrictive conditions possible in accordance with the Commission's Research Paper No. 1, and consistent with the need to maintain institutional order.

## IX MISCELLANEOUS

1. The Legal Services of the Virgin Islands has generously volunteered to make an attorney available at the institution one morning a week. The institution shall see that an office is made available where the attorney and inmates can confer in private. The institution shall also assist the attorney, through a procedure developed by him, in setting up the interviews for each week's visit.

2. One staff member shall be assigned the duty of keeping abreast of the parole status of each inmate. This person shall advise the inmates of this status and their rights and responsibilities regarding parole. The member shall draft letters to the Parole Board where undue delays in parole board actions are apparent. This staff member

shall work with the Citizens Rehabilitation Committee, who will doubtless be of aid in this task.

3. This Court shall in the future strongly recommend that women offenders and offenders with mandatory life sentences be sent to other institutions. It is recommended that such inmates presently at Golden Grove be transferred. It is inefficient for the institution to attempt to deal with the special problems presented by these inmates when their number is so few.

4. An office shall be provided within the institution for the current LEPC correctional specialist so that she can better serve the inmates and staff.

And now, it is further ORDERED that the operation of this Order, save for the recommendation of the removal of the Acting Warden and Captain, shall be suspended for 20 days from the date hereof during which time the Government shall be given an opportunity to show cause why the findings of the Commission should not be adopted and why the minimum standards announced herein shall not be implemented.